UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| SIKIRU ADEYEYE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Cause No. 1:11-cv-1115-WTL-TAB |
| | ) |
| HEARTLAND SWEETENERS, LLC, | ) |
| | ) |
| Defendant. | ) |

### ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Court is the Defendant's motion for summary judgment (dkt. no. 34). The motion is fully briefed, and the Court, being duly advised, **GRANTS** the motion for the reasons set forth below.

### I.  STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the Court accepts as true the admissible evidence presented by the non-moving party and draws all reasonable inferences in the non-movant's favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Id.* Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## II.     BACKGROUND

Plaintiff Sikiru Adeyeye is a Nigerian national who is a lawful permanent resident of the United States. He began work as a packer/palletizer at Defendant Heartland Sweeteners, LLC ("Heartland") through a staffing company known as MS Inspection in March 2009. Adeyeye was hired full-time directly by Heartland in August 2009. After his hire, he worked as a material handler.

Adeyeye's father, who lived in Nigeria, died in May 2010. Adeyeye reported to his supervisors that his father had died and that he would need to travel to Nigeria for the funeral ceremony. He indicated that he would need to save money to return to Nigeria for the ceremony and would require leave in the future.

Thereafter Adeyeye made two formal requests for leave to his supervisors. On July 19, 2010, Adeyeye delivered his first letter:

> I hereby request for five weeks leave in order to attend funeral ceremony of my Father. This is very important for me to be there in order to participate in the funeral rite according to our custom and tradition.
>
> The ceremony usually cover from three to four weeks [illegible] is two weeks after the burial, there is certain rite that all the children must participate. And after the third week, my mother will not come out until after one month when I have to be there to encourage her, and I have to kill five goats, then she can now come out. This is done [illegible] compulsory for the children so that the death will not come or take away any of the children's life.
>
> I will appreciate if this request is approved.

Heartland denied Adeyeye's first request by letter on August 25, 2010. Adeyeye then wrote a second formal request on September 15, 2010:

> I hereby request for my one week vacation, and three weeks leave in order to attend the funeral ceremony of my Father in my country, Nigeria – Africa which is taking place by October next month.

> This is the second time I will inform you and request for this travelling trip from the company but no reply to this matter. Nevertheless, the burial will be taking place by October next month and I have to be there and involved totally in this burial ceremony being the first child and the only son of the family.
>
> I therefore request for this period stated above for this trip and back to my work by November 4th, 2010.
>
> Your help towards this matter will highly be appreciated.

On September 15, 2010, Heartland again denied Adeyeye's request. Both denials provided that the request was denied "due to business need" because Adeyeye's absence "for that period of time would negatively affect the business." Both denials were signed by Dustin Mehringer, the production manager. Keith Bottoms, the plant manager, had "sole authority" to grant or deny the leave requests and directed Mehringer to deny the requests. Each denial offered Adeyeye the alternative to "voluntarily terminate" his employment and reapply once he returned, but noted that there was no guarantee that he would be rehired.

Bottoms testified at his deposition that the phrase "due to business need" meant that "having an employee off for an extended period of time and then having to set a precedent at the plant, other employees would want to have that type of time off, and I didn't think that was something that the business could support." In April 2010, Bottoms and Mehringer had authorized leave for another employee, Victor Pena, to take a two week vacation to visit his sick grandmother in Mexico. Bottoms testified that he granted Pena's leave because "at the time we felt we could spare him so we allowed him to go" and that productivity at the plant did not suffer when Pena was gone. However, after Pena's leave was granted, Bottoms "thought about it" and "grew concerned" because there were "a lot of employees who were from Mexico or Central America, obviously a couple employees from Africa" and he worried about whether Heartland "could . . . sustain a run if every employee every time something happens says I need two, three,

four weeks. . . . [A]nd the answer was we didn't feel like we could and we didn't feel like that was a policy that we could continue to do." After Bottoms made this decision, an employee originally from a country in Africa, Rotimi Kolurejo, asked for leave to return to Africa to get married. Bottoms denied the leave, but told Kolurejo that he could resign and reapply for the job on his return; if there was an opening at Heartland at that time, then he would be rehired. Kolurejo took advantage of the resignation/rehire option.

Even though the Company denied his request for leave, Adeyeye felt compelled to attend the funeral. Adeyeye saved money for the trip, took out a loan using his car as collateral, and traveled back to Nigeria for the ceremony on October 6. Adeyeye then performed the rites required for his father's ceremony. On completion of the funeral ceremony, Adeyeye returned to Indianapolis and reported back to work. On November 2, 2010, when he reported to work, he was informed that he had been terminated in a letter dated October 14, 2010.

Adeyeye filed a charge of discrimination with the Equal Employment Opportunity Commission on January 28, 2011, and received a right to sue letter on May 18, 2011. He then filed suit in this Court, alleging discrimination based on religion and national origin. Heartland has now moved for summary judgment on both discrimination claims.

### III.   DISCUSSION

Pursuant to Title VII of the Civil Rights Act of 1964, it is an unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion . . . or national origin." 42 U.S.C. § 2000e-2. Religion "includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to [sic] an employee's or prospective

employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

Adeyeye's claim for religious discrimination is multi-layered; first, he argues that Heartland failed to accommodate his religious observance, and second, he argues that Heartland terminated him for missing work, which absence resulted from its refusal to accommodate his required religious practice. Adeyeye does not argue that Heartland's decision to terminate his employment resulted independently from animosity toward his religion itself. It follows that if Heartland did not fail to accommodate Adeyeye, then its decision to terminate his employment because of his unexcused absence cannot subject it to liability.

"In order to make out a prima facie case of religious discrimination based on an employer's failure to provide reasonable accommodation, a plaintiff must show that the observance or practice conflicting with an employment requirement is religious in nature, that [he] called the religious observance or practice to [his] employer's attention, and that the religious observance or practice was the basis for [his] discharge or other discriminatory treatment. *Porter v. City of Chicago*, --- F.3d ----, 2012 WL 5439894 at *4 (7th Cir. 2012) (internal citations omitted). The burden then shifts to the employer to show either that it offered to reasonably accommodate the employee or that doing so would cause undue hardship. *Id.*

The parties argue at length about whether Adeyeye's attendance at and performance of his father's funeral rites were part of Adeyeye's own religious beliefs. Heartland stresses that Adeyeye testified in his deposition that the "rites and customs [he] referred to earlier" – apparently the "drums and people following [Adeyeye] around and killing of goats" – were not his beliefs, but his father's. At the same time, however, Adeyeye points out that one's belief in the necessity of a certain set of rituals is distinct from one's belief in the necessity of *performing*

5

the rituals ascribed to by another after his death in order to prevent others' deaths.[1] The distinction is a rather fine one and the Court is not entirely convinced that it qualifies as a religious belief under Title VII. However, even if the Court were to assume that it qualified, Adeyeye's claim fails on the second element of his prima facie case: notice to his employer.

> A person's religion is not like his sex or race—something obvious at a glance. Even if he wears a religious symbol, such as a cross or a yarmulke, this may not pinpoint his particular beliefs and observances; and anyway employers are not charged with detailed knowledge of the beliefs and observances associated with particular sects.

*Reed v. Great Lakes Cos.,* 330 F.3d 931, 935-36 (7th Cir. 2003). Rather, Title VII imposes a "reciprocal duty on the employee to give fair warning of the employment practices that will interfere with his religion and that he therefore wants waived or adjusted." *Id.* at 935.

Adeyeye argues that the two letters he wrote to his supervisors identified a specific religious practice that conflicted with his obligations at work.[2] According to Adeyeye, using the

---

[1] Adeyeye gave the following testimony at his deposition:

Adeyeye: Yeah, I am a Christian. So my kids now will follow my own rite. So like my father now, they'll follow his own rite. So like me now, I have my family now, so I can decide on my own. Like when I don't have family, I cannot decide on my own. So we have the right to do what I go to, so to sacrifice, to fulfill our rite, to fulfill the rite.

[ . . . .]

Counsel: So the rites and customs that you referred to earlier, those are separate than your Christian beliefs?

Adeyeye: Yeah. That's what they believe, that is my father's belief.

Counsel: That was your father's belief?

Adeyeye: My father.

Counsel: Not your belief?

Adeyeye: Yeah.

[2] Adeyeye's deposition testimony suggests that he also had conversations about the funeral rites with others at work, but Adeyeye does not argue that any of these conversations put Heartland on notice.

6

term "rite" and identifying the spiritual consequences of not participating ("so that death will not come or take away any of the children's life) should have put Heartland on notice of the religious nature of his request. To find otherwise, Adeyeye argues, would be to permit an employer to shield itself from liability by intentionally remaining in the dark. Whether these words and phrases on their own would have given a reasonable employer a religious tingle, however, is not the question, for one must consider the entire letter. Adeyeye indicates in the first letter that he must take vacation in order to participate in the funeral rite "according to our custom and tradition." Religious practice involves custom and tradition surely, but not all custom and tradition invoke the spiritual. Furthermore, the reference to custom and tradition at the exclusion of religion suggests that this request was not based on religion, which is not surprising, given that Adeyeye testified at his deposition that the rites he performed were not part of his own beliefs. Assessing the letters as a whole, the Court finds that these letters are insufficient evidence from which a jury could conclude that Adeyeye put Heartland on notice of his need for religious accommodation. *See Xodus v. Wackenhut Corp.*, 619 F.3d 683, 686 (7th Cir. 2010) (upholding district court's finding that employer was not on notice of religious reasons for job applicant's dreadlocks when applicant stated that cutting dreadlocks would be against his "belief"). Heartland is therefore entitled to summary judgment as to this claim.[3]

Adeyeye also asserts that Heartland discriminated against him because of his national origin when it failed to grant his request for leave. In his response brief, Adeyeye explains that he proceeds under the "direct method" of proving that Heartland's denial of leave was based on a discriminatory motive.

---

[3] Because Adeyeye's claim fails as to prong two, the Court does not address prong three.

A plaintiff may prove unlawful employment practices directly or indirectly. "To avoid summary judgment under the direct approach, the plaintiff must produce sufficient evidence . . . to create a triable question of intentional discrimination in the employer's decision." *Silverman v. Bd. of Educ. of Chicago,* 637 F.3d 729, 733 (7th Cir. 2011). The plaintiff proceeds under the direct method by proving the practice by either direct or indirect evidence. Indirect or circumstantial evidence relies on inference to create a "convincing mosaic" of evidence indicating intentional discrimination by the decision maker. *Id.* at 734. Circumstantial evidence "must point directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Stores, Inc.,* 324 F.3d 935, 939 (7th Cir. 2003). "Convincing mosaic" analysis utilizes three broad types of circumstantial evidence: (1) "suspicious timing, ambiguous statements [sic] oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn," (2) systematic better treatment of similarly situated employees who are not members of the protected class; and (3) "evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination." *Troupe v. May Dep't Stores Co.,* 20 F.3d 734, 736 (7th Cir. 1994). "Each type of evidence is sufficient by itself (depending of course on its strength in relation to whatever other evidence is in the case) to support a judgment for the plaintiff; or they can be used together." *Id.*

First, Adeyeye points to Heartland employee Victor Pena, who was granted leave to travel to Mexico to visit a sick grandmother. Adeyeye contends that discrimination can also be seen in the fact that the only other employee to request leave is also from Africa, and his request,

like Adeyeye's, was refused. The different circumstances of Pena's leave – a two-week leave for a sick, but still-living relative – fairly distinguish it from Adeyeye's request. On the other hand, it is harder to distinguish Kolurejo's request from Pena's; that is, unless one credits Bottoms' testimony that he had re-evaluated Heartland's leave policy in the interim. Adeyeye has not established any genuine issue of material fact as to Bottoms' testimony, nor has Adeyeye raised an inference that this reason is pretext for discrimination. Therefore, if this evidence adds anything at all to the convincing mosaic, it is weak at best.

Second, discriminatory intent is evident, according to Adeyeye, in the fact that Bottoms had heard someone make fun of Adeyeye's accent and maintenance manager Jeff Mack had "made fun" of the fact that Adeyeye had to kill goats as part of the funeral rites.[4] However, the jokes made about Adeyeye's accent provide no support for Adeyeye's claim, as the jokes are not attributed to any particular person. If a low-level or temporary employee made these remarks, they would have no bearing on the determination of whether Heartland intentionally discriminated against Adeyeye because of his national origin. *See Mlynczak v. Bodman*, 442 F.3d 1050, 1057-58 (7th Cir. 2006) ("Stray remarks made by non-decisionmakers are not evidence that the decision had a discriminatory motive."). Likewise, Maintenance Manager Jeff Mack "made fun" of the fact that Adeyeye had to kill goats as part of the funeral rite, but the record does not indicate how, if at all, Mack was involved in the decisionmaking process. In fact, Bottoms testified at his deposition that he had "sole authority" to grant or deny Adeyeye's vacation request. As such, comments about Adeyeye's accent and Mack's remarks add nothing to the mosaic.

---

[4] Heartland argues that these statements are inadmissible hearsay, but neither of these statements is being offered for the truth of the matter asserted. In fact, the record does not even divulge the specific contents of those statements.

9

Finally, Adeyeye argues that the "absolute failure of Heartland to take his sincere religious belief seriously" is indicative of its discrimination against him for his national origin. As an initial matter, the Court has already found that Adeyeye's letters did not put Heartland on notice that he was making a request for a religious accommodation. However, even more fundamentally, Adeyeye does not connect the dots between failing to take one's religion seriously and discriminating against an employee because of his national origin. These personal characteristics may often go hand in hand, but they are not inextricably linked.

In sum, Adeyeye has but one tile for his mosaic and it is a blurry one at best: the fact that Pena, an employee with a different national origin than Adeyeye, was granted leave while Adeyeye was not. This is not the sort of "convincing" mosaic envisioned under the direct framework and is insufficient to raise an inference of intentional discrimination against Adeyeye because of his national origin. Accordingly, Heartland is entitled to summary judgment on this claim.

## IV.     CONCLUSION

For the foregoing reasons, the Defendant' motion for summary judgment is **GRANTED**.

SO ORDERED:   12/07/2012

_William T. Lawrence_
Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.