In the

# United States Court of Appeals

## For the Seventh Circuit

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

No. 12-3820

SIKIRU ADEYEYE,

*Plaintiff-Appellant,*

*v.*

HEARTLAND SWEETENERS, LLC,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:11-cv-01115-WTL-TAB—**William T. Lawrence**, *Judge.*

ARGUED MAY 30, 2013—DECIDED JULY 31, 2013

Before SYKES and HAMILTON, *Circuit Judges*, and STADTMUELLER, *District Judge.**

HAMILTON, *Circuit Judge.*  Title VII of the Civil Rights Act of 1964 prohibits discrimination in employment on the basis of religion. Among other consequences, the law requires a covered employer to provide a rea-

---

* The Honorable J.P. Stadtmueller of the Eastern District of Wisconsin, sitting by designation.

sonable accommodation for an employee's request to participate in a religious observance or practice if an accommodation would not cause the employer undue hardship. Plaintiff Sikiru Adeyeye made such a request to his former employer, defendant Heartland Sweeteners, LLC, after his father's death. Adeyeye is a native of Nigeria who moved to the United States in 2008. He requested several weeks of unpaid leave so he could travel to Nigeria to lead his father's burial rites. He explained to Heartland that his participation in the funeral ceremonies was "compulsory" and that if he failed to lead the burial rites, he and his family members would suffer at least spiritual death. Heartland denied Adeyeye's request, but he traveled to Nigeria for the ceremonies anyway. He was fired when he returned and reported to work.

Adeyeye filed this suit under Title VII for failure to accommodate his religion. The district court granted summary judgment for Heartland, finding that Adeyeye's two written requests did not present evidence sufficient for a reasonable jury to find that he had provided Heartland notice of the religious character of his request for unpaid leave. We disagree. Whether or not Adeyeye's letters might have justified holding as a matter of law that they provided sufficient notice of the religious nature of his request (a question we do not decide), they certainly are sufficient to present a genuine issue of material fact regarding whether Heartland had notice of the religious nature of the request. We also find that genuine issues of material fact prevent us from affirming summary judgment on

any of the other grounds argued by Heartland. We reverse the district court's judgment and remand for further proceedings consistent with this opinion.

## I. *Religious Accommodation Claims Under Title VII*

Title VII prohibits employers from discriminating against employees and job applicants based on their religion. 42 U.S.C. § 2000e-2(a). The statutory definition of "religion" in Title VII is drafted as an unusual blend. It combines a broad substantive definition of religion with an implied duty to accommodate employees' religions and an explicit affirmative defense for failure-to-accommodate claims if the accommodation would impose an undue hardship on the employer. The statutory definition reads: "The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to [sic] an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

*United States v. Seeger* provides a helpful definition of religion: The test "is whether a given belief that is sincere and meaningful occupies a place in the life of its possessor parallel to that filled by the orthodox belief in God." 380 U.S. 163, 165–66 (1965). In interpreting what qualifies as religion under the broad statutory definition of Title VII, we have endorsed this standard that was used in *Seeger* to interpret the federal statute exempting conscientious religious objectors from military

conscription, finding that the definition serves equally well for the purposes of Title VII. See *Redmond v. GAF Corp.*, 574 F.2d 897, 901 n.12 (7th Cir. 1978) (explaining that a religious belief is a belief that is considered religious "in [the] person's own scheme of things" and is "sincerely held"). The broad definition applies to all religious beliefs that are sincerely held: "In such an intensely personal area, of course, the claim of the registrant that his belief is an essential part of a religious faith must be given great weight. . . . The validity of what he believes cannot be questioned. Some theologians, and indeed some examiners, might be tempted to question the existence of the registrant's 'Supreme Being' or the truth of his concepts. But these inquiries are foreclosed to Government." *Seeger*, 380 U.S. at 184 (reviewing criminal convictions for men claiming conscientious objections to military conscription).

Thus, a genuinely held belief that involves matters of the afterlife, spirituality, or the soul, among other possibilities, qualifies as religion under Title VII. See *Kaufman v. McCaughtry*, 419 F.3d 678, 681 (7th Cir. 2005) ("[W]hen a person sincerely holds beliefs dealing with issues of ultimate concern that for her occupy a place parallel to that filled by God in traditionally religious persons, those beliefs represent her religion.") (internal quotations and ellipses omitted).[1] There are three factors to

---

[1] The incorporation of some form of deity or deities into a belief system is not required for Title VII protection, which

(continued...)

consider when determining whether a belief is in fact religious for purposes of Title VII: (1) the belief necessitating the accommodation must actually be religious, (2) that religious belief must be sincerely held, and (3) accommodation of the employee's sincerely held religious beliefs must not impose an undue hardship on the employer. *Redmond*, 574 F.2d at 901 n.12.

To prove a Title VII claim for failure to accommodate religion, an employee must prove three things: (1) "the observance or practice conflicting with an employment requirement is religious in nature;" (2) the employee "called the religious observance or practice to [the] employer's attention;" and (3) "the religious observance or practice was the basis for [the employee's] discharge or other discriminatory treatment." *Porter v. City of Chicago*, 700 F.3d 944, 951 (7th Cir. 2012) (internal quotations omitted). If the employee shows these elements, the burden then shifts to the employer to show that it could not accommodate the employee's religious belief or practice without causing the employer undue hardship. *Baz v. Walters*, 782 F.2d 701, 706 (7th Cir. 1986). With these background principles in mind, we turn to the evidence Adeyeye presented to support his claim of religious discrimination based on the failure to accommodate his need to participate in burial rites for his father.

---

[1] (...continued)
recognizes atheism as a religion. *Reed v. Great Lakes Cos.*, 330 F.3d 931, 934 (7th Cir. 2003).

II. *The Summary Judgment Issues*

We review a district court's grant of a summary judgment motion *de novo. Porter,* 700 F.3d at 950. The non-moving party is entitled to the benefit of conflicts in the evidence and all reasonable inferences that could be drawn in his favor. We must reverse if a genuine issue of material fact exists that would allow a reasonable jury to find in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–51 (1986); *Forrest v. Prine*, 620 F.3d 739, 742–43 (7th Cir. 2010). To determine whether genuine issues of material fact exist, we ask if "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

Adeyeye's claim for failure to accommodate his religion is straightforward. He asserts that his request for unpaid leave was motivated by his own genuine, sincerely held religious beliefs that he had to perform his father's burial rites. He provided employer Heartland ample notice that he sought unpaid leave for religious reasons. He then missed work to perform the burial rites and was fired because of this absence.

The district court did not reach the religious belief or cause elements of Adeyeye's claim, finding only that he did not provide sufficient evidence that Heartland had notice of the religious nature of his request for leave. We address first our disagreement with the district court's conclusion on the notice element. Because Heartland argues that we should affirm the

district court's judgment on other grounds that were argued both in the district court and on appeal, we also address whether Adeyeye offered sufficient evidence of his sincere religious beliefs, whether his religious practice caused his termination, and finally whether Heartland showed as a matter of law that any possible accommodation would have imposed an undue hardship on it.

### A. *Notice*

To prove his claim of failure to accommodate his religion, Adeyeye must show that he "called the religious observance or practice to [his] employer's attention." *Porter,* 700 F.3d at 951; *Redmond*, 574 F.2d at 902 ("The employee has the duty to inform his employer of his religious needs so that the employer has notice of the conflict."). As we have explained before, religion is not necessarily immediately apparent to others, and employers are "not charged with detailed knowledge of the beliefs and observances associated with particular sects." *Reed v. Great Lakes Cos.*, 330 F.3d 931, 935–36 (7th Cir. 2003). As a result, an employee who wants to invoke an employer's duty to accommodate his religion under Title VII must give the employer fair notice of his need for an accommodation and the religious nature of the conflict. *Id.* (affirming summary judgment for employer where employee failed to give employer fair warning of conflict between religion and employment requirements). At the same time, an "employer cannot shield itself from liability . . . by

intentionally remaining in the dark." *Xodus v. Wackenhut Corp.*, 619 F.3d 683, 686 (7th Cir. 2010) (internal quotations omitted).

An employee may say in so many words, "I need to take unpaid leave to comply with a religious duty." That would certainly be clear enough, but Title VII has not been interpreted to require adherence to a rigid script to satisfy the notice requirement. Quite the contrary: Title VII is a remedial statute that we construe liberally in favor of employee protection. Title VII, like the Americans with Disabilities Act, was written to deal with real communications between employees and managers, and the law expects both to be reasonable. The employee must make the request reasonably clear so as to alert the employer to the fact that the request is motivated by a religious belief. The employer, in turn, must be alert enough to grasp that the request is religious in nature. If the employer is not certain, managers are entitled to ask the employee to clarify the nature of this request.

In light of the need for fair notice and the employer's reciprocal duty to pay attention to requests for religious accommodation, let's look at Adeyeye's first written request for leave, dated July 19, 2010:

> I hereby request for five weeks leave in order to attend funeral ceremony of my father. This is very important for me to be there in order to participate in the funeral rite according to our custom and tradition. The ceremony usually cover from three to four weeks and is two weeks after the burial, there

is certain rite[s] that all of the children must partici-
pate. And after the third week, my mother will
not come out until after one month when I have to
be there to encourage her, and I have to [k]ill five
goats, then she can now come out. This is done com-
pulsory for the children so that the death will not
come or take away any of the children's life. I will
appreciate if this request is approved.

After this request was denied, Adeyeye wrote a
second request dated September 15, 2010, in which he
reduced his request from five weeks of unpaid leave to
one week of (already earned) vacation and three weeks
of unpaid leave:

I hereby request for my one week vacation and
three weeks leave in order to attend the funeral cere-
mony of my father in my country, Nigeria — Africa,
which is taking place by October next month. This
is the second time I will inform you and request
for this travelling trip from the company but no
reply to this matter. Nevertheless, the burial will be
taking place by October next month and I have to
be there and involved totally in this burial ceremony
being the first child and the only son of the family.
I therefore request for this period stated above for
this trip and back to my work by November 4th,
2010. Your help towards this matter will highly be
appreciated.

These requests to Heartland would allow a reasonable
jury to find that Adeyeye gave sufficient notice of the
religious nature of his request for unpaid leave. His

first request referred to a "funeral ceremony," a "funeral rite," and animal sacrifice. He explained that participation in the funeral ceremonies was "compulsory" and that the spiritual consequence of his absence would be his own and family members' deaths. A reasonable jury could certainly find that the letter's multiple references to spiritual activities and the potential consequences in the afterlife provided sufficient notice to Heartland that Adeyeye was making a religious request. The second request was not as specific as the first, but referred to a funeral ceremony and burial ceremony and the importance of his attendance as the first child and only son. At least when read with the first letter in mind, it also conveyed a religious request with sufficient clarity to preclude summary judgment on the issue.

We recognize, of course, that the religious beliefs and practices Adeyeye referred to are not as familiar as beliefs and practices closer to the modern American mainstream. But the protections of Title VII are not limited to familiar religions. See *Redmond*, 574 F.2d at 900–01 (Title VII protects conduct that is "religiously motivated" and includes "all forms and aspects of religion, however eccentric"), quoting *Cooper v. General Dynamics*, 533 F.2d 163, 168 (5th Cir. 1976). If the managers who considered the request had questions about whether the request was religious, nothing would have prevented them from asking Adeyeye to explain a little more about the nature of his request without risking the sort of hostility to an employee's religion that was at issue in *Venters v. City of Delphi*, 123 F.3d 956, 972

(7th Cir. 1997) (reversing summary judgment for employer where supervisor made clear his expectations that employee needed to share supervisor's religious beliefs and values), or *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1037 (10th Cir. 1993) (affirming summary judgment for employer; employee failed to show supervisors' hostility to his religion motivated decision to fire him). The law leaves ample room for dialogue on these matters. The district court erred by granting summary judgment on the question of notice.

B.  *Sincerely Held Religious Belief*

Heartland argues in the alternative that it is entitled to summary judgment because Adeyeye did not participate in his father's funeral rites based on a sincere religious belief of his own but acted instead based on his perceived duties as a son, duties that are not protected by Title VII. The difference is important because only *religious* beliefs, observances, and practices must be accommodated.  And it is not enough for the belief to be religious in nature, it must also be the employee's own religious belief. As Heartland argues, therefore, if Adeyeye was observing his father's religious beliefs only to fulfill his own personal filial duty or to honor his father, Title VII would not require a religious accommodation because the request would not be driven by Adeyeye's own personal religious beliefs, observances, or practices.

To satisfy this element of his claim, Adeyeye must present evidence that would allow a reasonable jury to

find that (1) "the belief for which protection is sought [is] religious in [the] person's own scheme of things" and (2) that it is "sincerely held." *Redmond*, 574 F.2d at 901 n.12 (internal quotations omitted). The district court did not decide this issue. Heartland contends that the undisputed evidence shows that Adeyeye does not sincerely believe in the religion that requires these burial rites but was acting instead out of a filial duty that Title VII does not recognize or protect. We disagree.

The evidence presented by Adeyeye and discussed below is sufficient to show that Adeyeye's religious request to attend his father's funeral in Nigeria so that he could perform specific rites, traditions, and customs was borne from his own personally and sincerely held religious beliefs. That is to say, a jury could find that for Adeyeye to observe his religion appropriately, it was necessary for him to participate in the burial ceremonies. Adeyeye has argued this from the beginning, so challenges to his evidence on this element focus on whether or not Adeyeye's claim that his religion compelled him to participate in the burial rites was in fact sincere.

In our view, the issue is Adeyeye's sincerity, but that does not require a deep analysis of his conscious and/or subconscious reasons or motives for holding his beliefs. As Adeyeye's counsel aptly noted in oral argument, the prospect that courts would begin to inquire into the personal reasons an individual has for holding a religious belief would create a slippery slope we have no desire to descend. Has the plaintiff had a true conversion experience? Is he following

religious practices that are embedded in his culture and family upbringing? Is he making Pascal's coldly rational wager to believe in God based on his self-interest? These questions are simply not an appropriate or necessary line of inquiry for courts. We are not and should not be in the business of deciding whether a person holds religious beliefs for the "proper" reasons. We thus restrict our inquiry to whether or not the religious belief system is sincerely held; we do not review the motives or reasons for holding the belief in the first place.

Adeyeye was born in Nigeria and lived there until he moved to the United States as a legal permanent resident in 2008. In his deposition testimony and declaration, Adeyeye explained that his family's religion is a blend of Christianity and customs, traditions, and ceremonial rites developed in his Nigerian village. As a part of this religion, the specific dictates of each family's religious practice are identified, determined, and required by the father or male head of the household. Thus, participating in the rites and traditions identified by his father is a necessary part of Adeyeye's religious observance. Adeyeye explained this in his deposition: "I have to go to Nigeria to go to perform my rites. Being — my rites — what I mean by rite, we have a customary rite, our whole culture. So being the main child of the family, so I have to go there and perform a rite."

Adeyeye identified these religious rites in his letters requesting unpaid leave, quoted above, as well as in his

deposition and declaration. They included leading an extended procession through the village, animal sacrifice in the form of killing five goats, and cutting off his mother's hair and anointing her head twice with snail oil while she remained secluded in her home for one month of mourning until Adeyeye coaxed her to exit her home and to reenter society.

Under Title VII's broad and intentionally hands-off definition of religion, such beliefs and practices are protected from discrimination. "A personal religious faith is entitled to as much protection as one espoused by an organized group." *Vinning-El v. Evans*, 657 F.3d 591, 593 (7th Cir. 2011). It is not within our province to evaluate whether particular religious practices or observances are necessarily orthodox or even mandated by an organized religious hierarchy. "Courts should not undertake to dissect religious beliefs because the believer admits that he is 'struggling' with his position or because his beliefs are not articulated with the clarity and precision that a more sophisticated person might employ." *Thomas v. Review Bd. of Indiana Employment Sec. Division*, 450 U.S. 707, 715 (1981).

Title VII and courts also do not require perfect consistency in observance, practice, and interpretation when determining if a belief system qualifies as a religion or whether a person's belief is sincere. These are matters of interpretation where the law must tread lightly. "Particularly in this sensitive area, it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common

faith. Courts are not arbiters of scriptural interpretation." *Id.* at 716; see also *Grayson v. Schuler*, 666 F.3d 450, 454–55 (7th Cir. 2012) ("[A] sincere religious believer doesn't forfeit his religious rights merely because he is not scrupulous in his observance; for where would religion be without its backsliders, penitents, and prodigal sons?").

Adeyeye has presented sufficient evidence for a jury to find that he was acting on the basis of his own, sincere, religious beliefs. Arguing to the contrary, Heartland relies heavily on the following exchange in his deposition:

> Q:  So the rites and customs that you referred to earlier, those are separate from your Christian beliefs?
>
> A:  Yeah. That's what they believe, that is my father's belief.
>
> Q:  That was your father's belief?
>
> A:  My father.
>
> Q:  Not your belief?
>
> A:  Yeah.

The first problem with this exchange is that the last and supposedly decisive answer is completely ambiguous. The question was an informal fragment. Suppose we reasonably interpret it as asking, "Was that not your belief?" The negative form of the question still makes the response "Yeah" inconclusive. Did he mean "yes, it was not my belief," or "yes, it was my belief"?

Even if we overlook the ambiguous exchange and interpret it as Heartland suggests, it is not the only evi-

dence on the question. In response to the questions before and after the quoted exchange, Adeyeye explained that upon immigration to the United States, he, as head of his household, identified the religious rites and traditions his immediate family would observe and that these practices were not identical to the religious practices his family observes in Nigeria. He also made clear, however, that this is consistent with an inter-generational form of faith and practice where part of the belief system is that the head of each household has the privilege and responsibility of determining the family's exact practices. Adeyeye clarified this further in his declaration: "The Christian religion in which I was raised incorporates the traditional rites and customs of my village and family. Under these traditions, my father, as the head of the family, determined the religious practices, beliefs and customs for his household. I believe that I was spiritually compelled to follow these practices, beliefs, and customs in connection with the death and burial of my father."[2]

Adeyeye also testified about the spiritual consequences of his failure to carry out his father's burial rites: "I believe I was compelled by my religious beliefs to follow the traditional rites and customs established by my father as head of the household in connection with my

---

[2]  Adeyeye also explained this in his deposition: "Yeah, I am a Christian. So my kids now will follow my own rite. So like my father now, they'll follow his own rite. So like me now, I have my family now, so I can decide my own. Like when I don't have family, I cannot decide on my own."

father's death and funeral. I believe that if I failed to follow these rites, my father's death would have brought spiritual death upon both my mother and myself and would have prevented my mother and me from finding spiritual peace."[3]

Heartland's argument on this element seems to ask the court to reject the inter-generational dimension of Adeyeye's religion, which would require the court to probe and perhaps even to disapprove of the content of his own religious beliefs. As explained above, that is not a task appropriate for courts. Moreover, we cannot help but note that Adeyeye's professed belief that his faith required him to follow his father's directions about matters of faith and ritual seems to fit very comfortably with the Judeo-Christian divine commandment to honor thy father and thy mother. See Ex. 20:12; Deut. 5:16. Thus, we do not see the bright line between the

---

[3] In his deposition, Adeyeye explained that as the first son, he was required both to cut his mother's hair and to ensure that she exited her home a month later "so that she will not be disgraced . . . and the death will not come upon her. We, the children, the dead will not lie on us. If you don't do that is going to last. The children and the mother, so that to avoid disgrace and to avoid the death of their mother. So that is why we need to perform the rite." Adeyeye also explained this in his letters requesting unpaid leave. Adeyeye identified the rites discussed above, explained that they would last four to five weeks, and explained that his attendance was mandatory "so that the death will not come or take away any of the children's life."

father's faith and the son's faith that Heartland sees. Lastly, while not necessary given the other evidence, a jury may very well find it relevant evidence of sincerity that Adeyeye was willing to risk his job and put up his car as collateral for a loan to fund his trip to Nigeria to participate in these burial rites. The record provides sufficient evidence for a reasonable jury to find that Adeyeye was acting on the basis of his own sincere religious beliefs.

## C. *Causation*

Heartland argues next that Adeyeye has no evidence that "the religious observance or practice was the basis for [his] discharge or other discriminatory treatment." *Porter v. City of Chicago*, 700 F.3d 944, 951 (7th Cir. 2012) (internal quotations omitted). The district court did not decide the issue, and we reject Heartland's argument. The record includes pictures of Adeyeye leading the burial rites. There is no question as to the cause of his absence. Heartland told Adeyeye he was terminated when he returned from Nigeria and reported to work. The termination letter explained that he had been "absent without having available earned personal time since October 7, 2010" and that he was terminated in accordance with Heartland's attendance policy.

Heartland argues that Adeyeye's termination was caused by his absence rather than the refusal to accommodate his religious beliefs. This is sophistry, as we have made clear before. See *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1575 (7th Cir. 1997) (explaining that plain-

tiffs "plainly were terminated for failing to work on Yom Kippur; whether or not [the employer's] decision to require that they do so was supported by legitimate concerns for its business goes to the issue of undue hardship, and not to whether a prima facie case was shown"). Adeyeye was absent to observe his religious practices, and he was fired as a result of that absence. It is as simple as that. There is ample evidence indicating that Adeyeye's religious observance caused his termination.

### D. *Undue Hardship*

Finally, Heartland argues we should affirm summary judgment on the theory that any accommodation of Adeyeye's religion would have imposed an undue hardship on it. On this issue, Heartland bears the burden of proof, so it must show, as a matter of law, that any and all accommodations would have imposed an undue hardship. 42 U.S.C. § 2000e(j); *Baz v. Walters*, 782 F.2d 701, 706 (7th Cir. 1986). The district court also did not decide this issue, and we reject Heartland's argument.

Adeyeye's second letter requested permission to take his one week of vacation together with three weeks unpaid leave to allow enough time to travel to Nigeria and participate in the burial rites. The Supreme Court has recognized unpaid leave as a reasonable and generally satisfactory form of accommodation for religious faith and practice: "The provision of unpaid leave eliminates the conflict between employment requirements and religious practices by allowing the individual to observe fully religious holy days and

requires him only to give up compensation for a day that he did not in fact work. Generally speaking, the direct effect of unpaid leave is merely a loss of income for the period the employee is not at work; such an exclusion has no direct effect upon either employment opportunities or job status." *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 70–71 (1986) (internal quotations omitted).

Reasonableness is assessed in context, of course, and this evaluation will turn in part on whether or not the employer can in fact continue to function absent undue hardship if the employee is permitted to take unpaid leave on the needed schedule. We recognize that extended absences may pose challenges for employers. We must also recognize that many employers also manage their work around employees' vacations and medical leaves that may last several weeks or even longer. The issue of undue hardship will depend on close attention to the specific circumstances of the job and the leave schedule the employee believes is needed.

On this issue, Heartland is not entitled to summary judgment. Its evidence does not show that any reasonable jury would have to find that permitting Adeyeye to take three weeks of unpaid leave in conjunction with his week of vacation would have created an undue hardship for Heartland. We reach this conclusion based on the specific evidence in this case, which showed that during his tenure at Heartland, Adeyeye had two jobs: material handler and packer/palletizer. The evidence would permit a jury to

find that Heartland expects and plans for high turnover of workers in both job categories without compromising quality or productivity. The factory where Adeyeye worked is staffed by temporary workers as well as permanent workers. At the time of Adeyeye's departure, half of the shifts for the packer/palletizers and one third of the shifts for material handlers were staffed by temporary workers. Heartland expected and planned for the frequent turnover of employees by keeping a ready list of temporary workers who usually reported to Heartland within an hour of a request. Title VII requires proof not of minor inconveniences but of hardship, and "undue" hardship at that. 42 U.S.C. § 2000e(j). In light of the evidence of high turnover, frequent use of temporary workers, and a ready supply of substitutes, a reasonable jury would not be required to find that an unpaid leave of several weeks for Adeyeye would have imposed an undue hardship on Heartland.

Heartland argues, nevertheless, that *any* inconvenience or disruption, no matter how small, excuses its failure to accommodate, relying on the language in *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977), saying that an accommodation of religion requiring anything more than a "*de minimis* cost" creates undue hardship. Heartland has read too much into this phrase in *Hardison*. The Equal Employment Opportunity Commission reads the *Hardison* language as meaning that regular payment of premium wages (such as overtime or holiday wage rates) for substitutes would impose an undue hardship, while administrative costs such as those incurred in rearranging schedules and recording

substitutions for payroll purposes would not amount to an undue hardship. 29 C.F.R. § 1605.2(e)(1). *Hardison* is most instructive when the particular situation involves a seniority system or collective bargaining agreement, as in *Hardison* itself. Its broad reference to "more than a *de minimis* cost" should be understood in this context, especially when we consider the Court's strong endorsement of unpaid leave as a reasonable accommodation for employees' religious schedules, see, *e.g.*, *Ansonia Board of Education*, 479 U.S. at 70, and when we keep in mind both words in the key phrase of the actual statutory text: "undue" and "hardship." Again, a jury would not be required to find an undue hardship here.

Finally, we consider Heartland's argument that it did provide Adeyeye with a reasonable accommodation in the form of voluntary self-termination with the possibility of being rehired. Heartland had the good sense to relegate this argument to a footnote. It has little to recommend to it. We strain to imagine a situation in which such an offer could be considered an accommodation, nor could we locate a federal court in the country opining that such an accommodation could be reasonable for a religious request. Title VII does not contemplate asking employees to sacrifice their jobs to observe their religious practices. At the risk of belaboring the obvious, Title VII aimed to ensure that employees would *not* have to sacrifice their jobs to observe their religious practices. An option of voluntary termination with the right to ask for one's old job later is not a reasonable accommodation.

No. 12-3820                                    23

   The judgment of the district court is REVERSED and
the case is REMANDED for further proceedings consistent
with this opinion.